UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Sandra DeMuth,

                            Plaintiff,

      v.

Linda McMahon et al.,

                            Defendants.

**Report and Recommendation**

16-CV-125A

---

## I. INTRODUCTION

Plaintiff Sandra DeMuth was hired by the Small Business Administration ("SBA") as an Information Technology Specialist at age 56. Plaintiff was not the only employee over age 50 who was hired while she was there. While plaintiff was there, employees under age 50 were fired for various reasons. Plaintiff worked the first several years at the SBA without any problems, but then the SBA hired another programmer who had about 13 more years of full-time information technology work experience than she did. That new programmer was assigned a project that plaintiff wanted based on her seniority and experience within the SBA. Coinciding with the failure to obtain that project, a series of problems began arising between plaintiff, the new programmer, and other coworkers. The problems culminated in accusations of discrimination on plaintiff's side and a formal Letter of Expectations and Performance Improvement Plan on her employer's side. The SBA ultimately decided that plaintiff had too many deficiencies in her performance for the projects to which she was assigned. The SBA fired plaintiff, and plaintiff sued claiming discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17; the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796l; and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634.

Defendants the SBA and Linda McMahon, sued in her official capacity as SBA Administrator, now have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 29.)  Defendants argue that many of plaintiff's allegations are time-barred because she did not present them to an equal employment opportunity ("EEO") counselor within the time required by the applicable regulations.  Defendants argue further that plaintiff simply did not complete a certain technical documentation project to their satisfaction, even after being told exactly how to perform through the Letter of Expectations and after being offered twice-weekly meetings with her supervisor to keep the project on track.  Plaintiff has conceded that she cannot make a prima facie case for age discrimination.  Plaintiff argues that her remaining allegations are timely, under the continuing-violation doctrine.  Plaintiff argues further that her remaining allegations should go to trial because she had no problems in the office until she, as the only female programmer, was passed over for preferred projects by a male programmer who just arrived.

District Judge Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 5.)  The Court held oral argument on December 18, 2018.  For the reasons below, the Court respectfully recommends granting defendants' motion.

## II.    BACKGROUND

This case concerns allegations that defendants progressively squeezed plaintiff, their only female programmer, out of their office environment in favor of preferred male programmers. Defendants hired plaintiff on November 28, 2005 as an Information Technology Specialist in the Office of Disaster Assistance ("ODA") in Buffalo, New York.  Plaintiff's hire was recommended by Thomas Guido ("Guido") and approved by ODA Director William Leggiero ("Leggiero").  Plaintiff was born in 1949 and was 56 years old when hired.

2

The first few years of plaintiff's employment at the ODA appear to have proceeded uneventfully. Plaintiff began at a particular salary grade called GS-11 IT Specialist. By December 2006, Guido recommended, and Leggiero approved, plaintiff's promotion to GS-12 IT Specialist. Around 2005 or 2006, ODA designated a person named Larry Lanza as a Lead IT Specialist in the area of telecommunications. Lanza was at least 50 years old at the time of his hire. (Dkt. No. 31-1 at 63.) Meanwhile, plaintiff's duties included the development, implementation, and support of software applications. Based on performance evaluations, plaintiff met or exceeded expectations from November 2005 through September 2009.

The events that eventually led to this case began with a personnel departure in 2009. That year, an ODA IT employee/contractor named Charles Appleby ("Appleby") fell ill and had to stop working. After Appleby left, defendants hired William Malek ("Malek"). Defendants hired Malek at the GS-12 level, not GS-11, because he had approximately 13 years of full-time work experience in information technology before arriving at the ODA. From the beginning, plaintiff and Malek did not get along. The parties sharply dispute why, but whatever happened, the record suggests a combination of a personality conflict and confusion about who would carry out what responsibilities. For example, the parties cannot even agree as to whether Guido in September 2009 assigned plaintiff the task of compiling a manual for software applications developed in the ODA. (*See* Dkt. No. 33-14 at 11–12 ("Response: Deny. In October 2009, Guido simply asked for links to where the manual was stored on the network.").) A lot of disputes also surround a certain web-based technology project that the ODA began developing in the fall of 2009. Defendants gave the project to Malek and insisted that he was the right person for the job, given significant web-development experience from prior employment. Plaintiff felt that she was the right person for the job based on her seniority and experience at the ODA. (*See* Dkt. No. 31-1 at 68.)

While the issue of the manual was unfolding, plaintiff underwent cataract surgery in December 2009 in both eyes. The surgery corrected the problem, and no doctor ever declared plaintiff disabled. Both before and after the surgery, Guido asked plaintiff what he could do to help. The parties dispute whether plaintiff encountered any difficulties in obtaining accommodations, but plaintiff acknowledges that certain written materials were eventually placed on the ODA's internal network, to allow her to read the text in an enlarged size. While plaintiff was on medical leave following her surgery, a problem arose with one of the ODA's applications called the Disaster Locator. The Disaster Locator application helps determine whether a disaster survivor can be eligible for federal assistance. Defendants assert that the application "went down," while plaintiff asserts that the application's malfunction was a known problem that could have been corrected by consulting a manual that Appleby had created. Either way, the parties agree that defendants called plaintiff while at home to see whether she could address the problem. Plaintiff corrected the problem, but not before another dispute arose as to whether she insisted on addressing the problem herself and refused to work with Malek.

The conflict between the parties worsened heading into 2010. The parties could not agree as to whether plaintiff had been assigned the applications manual project; by early 2010, they could not agree as to what the project entailed, what deadline had to be met, or whether plaintiff provided satisfactory content for the manual. In February 2010, plaintiff complained to Guido's supervisor about how the growing conflict in the office resulted from discrimination—namely, that Guido favored male employees. On March 23, 2010, Guido provided plaintiff with a Letter of Expectations that described deficiencies in plaintiff's performance. (Dkt. No. 31-3 at 2.) The Letter of Expectations included descriptions of incomplete technical documentation; delays in completing help desk tickets; missed deadlines; and poor time management. The Letter of Expectations then

4

explained what documentation and training had to be completed. In the letter, Guido established a schedule of helping plaintiff to meet these expectations by meeting with her twice weekly. The Letter of Expectations set a deadline of May 7, 2010 for the completion of goals described. On May 27, 2010, Guido gave plaintiff a letter evaluating her performance and how she fell short of meeting the goals set in the Letter of Expectations. (Dkt. No. 31-4 at 2.) Plaintiff refused to sign the letter to acknowledge receipt. On June 22, 2010, Guido gave plaintiff a written Performance Improvement Plan. (Dkt. No. 31-5 at 2.) In the letter, Guido explained how, in his view, plaintiff failed to complete the assignments described in the May 27 letter. Guido gave plaintiff 60 days to improve her performance, but then extended that time to October 15, 2010 to accommodate plaintiff's medical leave following surgery to relieve a blockage in a carotid artery. On October 15, 2010, plaintiff made formal contact with defendants' EEO counselor to complain about her treatment. By the fall of 2010, Guido still found plaintiff's attempts at improvement unacceptable. Guido sent plaintiff a letter on November 12, 2010 proposing her termination and explaining why. (Dkt. No. 31-6 at 2.) On January 11, 2011, Leggiero accepted the proposal and terminated plaintiff. (Dkt. No. 31-7 at 3.)

Plaintiff next exhausted her available administrative remedies. On December 22, 2010, plaintiff filed an administrative complaint with the SBA, alleging multiple forms of discrimination including retaliation for reporting discrimination. The SBA ruled against plaintiff in a final agency decision on June 26, 2012. The Merit Systems Protection Board affirmed the agency decision on March 15, 2013. The Equal Employment Opportunity Commission affirmed the agency decision on May 13, 2015 and then denied reconsideration on November 18, 2015.

Plaintiff filed her complaint on February 15, 2016. (Dkt. No. 1.) The complaint contained six claims. In the first three claims, plaintiff accused defendants of unlawful discrimination in

5

violation of Title VII, the Rehabilitation Act, and the ADEA, respectively.  In the last three claims, plaintiff accused defendants of retaliation in violation of Title VII, the Rehabilitation Act, and the ADEA, respectively.

Defendants filed the pending motion on July 31, 2018.  Defendants' arguments for summary judgment fall into two general categories: timeliness and threshold.  With respect to timeliness, defendants argue that plaintiff had 45 days from any perceived act of discrimination to initiate the counseling process with her office's EEO counselor.  Failure to initiate counseling within 45 days prohibits litigation over any alleged discrimination.  In defendants' view, because plaintiff did not initiate EEO counseling until October 15, 2010, she is prohibited from litigating any allegedly discriminatory conduct that occurred before September 1, 2010.  As for threshold, defendants argue that the events that she has cited after September 1, 2010 simply do not rise to the level of discriminatory or retaliatory conduct as a matter of law.  Apart from her termination in itself, plaintiff has cited to events after September 1, 2010 that include her evaluation on the Performance Improvement Plan and increased scrutiny of her performance on projects like the applications manual.  Defendants argue that, even giving plaintiff every favorable inference and considering all events as timely, the events that she has cited did not change her position or pay until her final termination for failure to improve:

> [M]any of the allegedly discriminatory actions claimed by plaintiff do not meet the standard for an adverse employment action including: (i) the hiring of William Malek in September 2009 (Exh. 2, p. 8, ¶ 1); (ii) a promotion received by Larry Lanza in 2006 (Exh. 2, pp. 8-9, ¶ 2); (iii) training received by Charles Appleby in July 2009 (Exh. 2, p. 9, ¶ 3); (iv) the issue of plaintiff not being invited to meetings between Guido and Malek (Exh. 2, p. 9, ¶ 4; p. 44, ¶ 96); (v) plaintiff's claim that she was denied the ability to earn credit hours (Exh. 2, p. 9, ¶ 5); (vi) alleged denial of opportunities to work overtime (Exh. 2, pp. 9-10, ¶ 7); (vii) Guido's call to plaintiff at her home while she recuperated from surgery in December 2009 (Exh. 2, p. 10, ¶ 8); (viii) the assignment of the web development project to Malek instead of plaintiff (Exh. 2, p. 10, ¶ 9; p. 44, ¶¶ 94-95); (ix) the March 23, 2010 Letter of Expectations (Exh. 2, pp. 10-11, ¶¶ 12-16); (x) the events concerning a meeting of May 7, 2010 in

6

which Guido allegedly refused to give plaintiff an extension of the deadline on the
applications manual project (Exh. 2, p. 11-12, ¶ 17, pp. 45-46, ¶ 100); (xi) the events
of August 2010 wherein Guido required plaintiff to maintain detailed time records
(Exh. 2, p. 18, ¶ 38); (xii) the events in August 2010 regarding SCR 018-10 (Exh. 2, p.
18, ¶ 39); (xiii) the events of August 24, 2010 regarding the completion of leave slips
(Exh. 2, p. 18, ¶ 40); (xiv) the change to plaintiff's work hours in October 2010 (Exh.
2, pp. 18-19, ¶ 41); (xv) plaintiff being required to include Kristin Hughes in her
communications with IT customers (Exh. 2, p. 44, ¶ 98); (xvi) the appointment of
Mark Parrish as a tester on Malek's projects (Exh. 2, p. 45, ¶ 99); (xvii) Guido's
delivery of plaintiff's applications manual to an SBA office in Herndon, Virginia by
means of photocopying (Exh. 2, p. 46, ¶ 101); and (xviii) a comment made by Malek
to plaintiff in September 2010 (Exh. 2, p. 47, ¶ 105). None of these incidents or
claims constitute an adverse employment action as they all involve minor issues
relating to work assignments, minor changes in work duties or hours, allegations of
excessive scrutiny, or single occurrence incidents that had no effect on plaintiff's
position or pay.

(Dkt. No. 32 at 9.) Defendants also note that "Guido has recommended the hiring of many female employees, including plaintiff, Hughes and others. Guido has also recommended the termination of employees without regard to gender: he recommended the termination of plaintiff, who is female, but he has also recommended the termination of three employees who were male." (*Id.* at 10.) Consequently, in defendants' view, plaintiff has not established any triable issues of fact regarding either discrimination or retaliation.

Plaintiff opposes the pending motion in most respects. "Plaintiff concedes that she will not be able to sustain her burden at this stage of establishing age discrimination." (Dkt. No. 33-15 at 11 n.1.) As for the issue of timeliness, though, plaintiff argues briefly that the various adverse actions taken against her were of a continuous nature, with at least some of them occurring after September 1, 2010. Plaintiff thus believes that all of her alleged adverse actions merit consideration. With respect to the threshold issue, plaintiff disputes the veracity of the description of her performance in the Letter of Expectations, the Performance Improvement Plan, and related evaluations. Plaintiff dismisses any sudden concern about her performance, after four uneventful years, as pretextual and retaliatory. "Moreover, Defendants' other assertions that Plaintiff did not handle help desk tickets,

7

did not provide the information that Guido wanted on a training questionnaire or did not add

reservists to the Active Directory are all thinly veiled attempts to justify a 'legitimate business

decision.'" (*Id.* at 10.) Plaintiff also points to the following examples of disparate treatment:

> In addition to the above discussed adverse actions, there were further discriminatory actions which smacked of disparate treatment. These actions included, but were not limited to, Malek was assigned project leads, even though DeMuth had several years more experience at the SBA. Further, Malek, as well as Larry Lanza, were hired as G-12's, whereas Plaintiff was hired as a G-11, despite there being no discernable reason for this disparity. Plaintiff, as plainly acknowledged by Guido, had appropriate credentials and experience at the time she was hired. Further, Plaintiff received only two trainings the entire time she was employed by SBA.
>
> Crucially, with the onset of the Applications Manual assignment in the fall of 2009, Plaintiff was tasked with completing a project that required more than one person to complete. There was no deadline set by Guido at the time of the assignment and Plaintiff diligently provided links and updates to Guido. Further, Plaintiff was not permitted to respond to Guido's "Letters."
>
> Essentially, the applications manual was the vehicle with which Guido used to retaliate and discriminate against plaintiff.
>
> Further, Plaintiff was the only non-probationary employee who was subject to formal negative performance evaluations by Guido, and was the only employee who was denied the ability to earn credit hours. Ultimately, she was the only non-probationary employee terminated by Guido due to purported performance issues.
>
> Moreover, plaintiff was continually singled out by Guido. A striking example of this was Malek being directed by Guido to, essentially, spy on Plaintiff.

(*Id.* at 12–13.)

In reply, defendants point to the amount of discovery that plaintiff declined to pursue over

the course of her case, here and at the administrative level:

> [P]laintiff presents no direct evidence of discriminatory or retaliatory intent and she does not even provide any circumstantial proof from which a fact-finder could infer the presence of discriminatory or retaliatory intent. For example, plaintiff alleges that her supervisor, Thomas Guido ("Guido"), "wanted a male in my position because most of the IT applications people at the SBA were male." Dkt. # 33, ¶ 33. Plaintiff provides no evidence for this proposition and, of course, ignores the salient point that Guido recommended that plaintiff be hired in November 2005 and

8

promoted the following year—strange behavior indeed for a supervisor who allegedly does not want female programmers as subordinates! In addition, most of the allegations upon which plaintiff relies occurred before September 1, 2010 and are time-barred by the 45-day statute of limitations.

The parties are now nearing the conclusion of seven years of administrative and district court litigation. Plaintiff had the opportunity, during the administrative phase and this action, to take the deposition of all relevant SBA employees mentioned in plaintiff's opposition papers, including Guido, Malek, Kristin Hughes, Larry Lanza, Deputy Director (now Director) Colleen Hiam, and Director (now retired) William Leggiero. She chose to only take the deposition of Guido during discovery in this action. In addition, the parties have exchanged well over 3000 pages of documents. Plaintiff's failure to provide evidentiary support for her allegations should be fatal to her claims at the summary judgment stage.

(Dkt. No. 40 at 2.)

### III. DISCUSSION

#### A. *Summary judgment motions generally*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

### B. Are some of plaintiff's claims time-barred?

Before determining what factual disputes require resolution by a jury, the Court will assess defendants' assertion that at least some of plaintiff's claims are time-barred. Title VII applies to federal government employment by way of 42 U.S.C. § 2000e-16. The Rehabilitation Act makes Title VII's rights and remedies available to federal employees by way of 29 U.S.C. § 794a. The ADEA has its own provisions to address age discrimination. *See* 29 U.S.C. §§ 623, 633a. "Prior to bringing suit under either Title VII or the ADEA, a federal government employee must timely exhaust the administrative remedies at his disposal. Failure to do so can be asserted by the government as an affirmative defense." *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001) (internal quotation marks and citation omitted). The same goes for the Rehabilitation Act. "EEOC regulations require an employee suing the federal government under the Rehabilitation Act to exhaust certain administrative remedies before initiating a suit in the district court. Thus, an aggrieved agency employee must first seek EEO counseling within forty-five days of the allegedly discriminatory act." *Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir. 2000) (citation omitted).

All three statutes that plaintiff has invoked use 29 C.F.R. § 1614.105(a) as the process by which federal employees must exhaust administrative remedies. Under the process, employees "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory," 29 C.F.R. § 1614.105(a)(1). "This timeliness requirement is not jurisdictional, and the filing deadline is subject to waiver, estoppel, and equitable tolling." *Bruce v. U.S. Dep't of Justice*, 314 F.3d 71, 74 (2d Cir. 2002) (citations omitted). "Courts may evaluate whether it would be proper to apply such doctrines, although they are to be applied sparingly." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (citation omitted). When considering whether to forgive a timeliness requirement for equitable reasons, courts have to make an important distinction between

discrete discriminatory acts and a repeated discriminatory practice that amounts to an ongoing policy. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. An example of a repeated practice would be acts creating a hostile work environment. "A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122. Other examples exist as well. "Although the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination, and although acts so isolated in time from each other or from the timely allegations as to break the asserted continuum of discrimination will not suffice, a continuing violation may be found where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation and editorial marks and citations omitted).

Here, plaintiff has not made enough of a showing to warrant the use of the continuing-violation doctrine. The parties agree that no actionable events occurred, and that plaintiff's performance was generally satisfactory, between her start in 2005 and the fall of 2009. After the hiring of Malek in 2009, plaintiff asserts that Malek "was resistant," "was hostile," and "refused to listen." (Dkt. No. 33-15 at 3.) These conclusory phrases do not cross the threshold for the types of repeated practices that could amount to an ongoing policy of discrimination. *Cf. Alers v. New York City Human Res. Admin.*, No. 06-CV-6131 SLT LB, 2008 WL 4415246, at *6 (E.D.N.Y. Sept. 24, 2008) (insensitive and offensive conduct without more does not create a continuing violation for a hostile work environment), *aff'd sub nom. Alers v. Human Res. Admin.*, 357 F. App'x 330 (2d Cir. 2009); *Fontanez v. Thompson*, No. 00 CIV. 2090 (DFE), 2003 WL 1964052, at *11 (S.D.N.Y. Apr. 24, 2003)

11

(assertion that defendant "embarked on a course to remove all supervisors and managers who were in their 50s and 60s from their positions" did not suffice to allege a policy or practice). In contrast, most of the problems that arose between the parties appear to be anchored around a few distinct events: Malek's hiring in 2009; the applications manual project; plaintiff's surgery in December 2009; issues with the disaster locator application in December 2009; and a web development project. The complaint confirms the Court's sense that individual events prompted poor relations between the parties. *Cf. Fitzgerald*, 251 F.3d at 365 (separating sexual advances from a hostile work environment and finding the former not protected under a continuing violation theory); *Hanfland v. Donahoe*, No. 10-CV-6106-FPG, 2015 WL 4930582, at *8 (W.D.N.Y. Aug. 18, 2015) (compiling cases in which transfer, suspension, discipline, promotion, compensation, and repeated denials of promotions and training opportunities were all discrete acts). Every claim in the complaint cites plaintiff's termination as an adverse action or plaintiff's performance letters as retaliatory actions. None of the claims asserts a hostile work environment or some similar repeated practice.

Consequently, the 45-day time limit in 29 C.F.R. § 1614.105(a)(1) will have to be enforced. Plaintiff initiated contact with her office's EEO counselor on October 15, 2010. (Dkt. No. 31-1 at 59.) Working back 45 days brings plaintiff to September 1, 2010. Any triable issues of fact in this case will have to have originated on or after September 1, 2010.

### C. Are plaintiff's remaining claims triable?

The Court now will turn to an assessment of events that allegedly occurred on or after September 1, 2010. "At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. At the first stage of the *McDonnell Douglas* analysis, the plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that: 1) he belonged

12

to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. The plaintiff's burden of proof at the *prima facie* stage is not onerous." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted). The same framework governs plaintiff's discrimination claims under the Rehabilitation Act and the ADEA. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (ADEA); *Teahan v. Metro-N. Commuter R. Co.*, 951 F.2d 511, 514 (2d Cir. 1991) (Rehabilitation Act).

Here, the first two elements of a *prima facie* case are not in serious dispute, but the third and fourth elements require closer attention. Plaintiff has conceded that she cannot establish a *prima facie* case of discrimination under the ADEA. (Dkt. No. 33-15 at 11.) As for the other discrimination claims, by September 1, 2010, plaintiff had received both a Letter of Expectations and a Performance Improvement Plan with respect to her technical documentation project. The letters together give plaintiff specific descriptions of how she had to improve her performance and what resources she had available to help, including weekly meetings with Guido and resources that would improve her training. The Letter of Expectations and Performance Improvement Plan did not change plaintiff's pay or any material terms or conditions of her employment. *Cf. Canady v. Union 1199*, 253 F. Supp. 3d 547, 554 (W.D.N.Y. 2017), *aff'd sub nom. Canady v. Univ. of Rochester*, 736 F. App'x 259 (2d Cir. 2018) (summary order) (Letter of Expectations was not an adverse employment action and was supported by prior disciplinary history). Around the same time, plaintiff returned from medical leave with a letter from her physician requesting that she be assigned light duty. Defendants complied with the request. Because of her medical leave, plaintiff received extra time to fulfill the requirements of the Performance Improvement Plan. Plaintiff concedes that any meetings

13

from which she might have been excluded were about Malek's Web application project and not about her technical documentation project. (Dkt. No. 33-14 at 30.) Plaintiff asserts that she was denied some opportunities to earn credit hours, but these denials overlapped with her time on the Performance Improvement Plan. *Cf. Krupa v. Dunkirk Specialty Steel, LLC*, No. 13-CV-76A, 2014 WL 6387283, at *8 (W.D.N.Y. Nov. 14, 2014) ("As for job opportunities, Krupa has repeated allegations that she was promised more training and that she ought to have received more training. By itself, however, Krupa's mere wish to have more responsibilities that would have led to more overtime does not constitute an adverse employment action.") (citation omitted). Meanwhile, plaintiff's concerns about management of help-desk tickets are not triable. Plaintiff admits that in October 2010, she was asked to provide a time estimate for completing a training questionnaire as either a web application or a Windows application; she provided a time estimate for the Windows option only. (Dkt. No. 33-14 at 36.) Any incidents with functional analyst Hughes appear to be isolated incidents that did not lead to any adverse actions. Defendants' critique of plaintiff's final technical documentation is based on design and content and does not appear to have a comparison to similar work done by other employees. Even granting plaintiff the benefit of all inferences, the undisputed circumstances point to differences in personalities and work expectations that fall within the range of managerial discretion and do not, without more, establish a *prima facie* case of discrimination. *Cf. Davis v. SSC Disability Servs., LLC*, 166 F. Supp. 3d 211, 214 (D. Conn. 2016) ("The only evidence in the record shows a pattern of deficient performance and that such deficient performance was the basis for the defendant's warnings and the ultimate termination of the plaintiff's employment."). And the above circumstances do not include the simpler fact that plaintiff worked at her office from 2005 until early 2011; that she had the same supervisor at all times; that older employees were hired during her time while younger male employees were terminated; and

that no problems arose until 2009 when plaintiff began having disagreements over projects that she preferred to have. Guido also typically left either Hughes, a female, or Lanza, a male over the age of 50, in charge in his absence. *Cf. Hoose v. Monroe Cty.*, No. 09-CV-6080T, 2014 WL 4184815, at *4 (W.D.N.Y. Aug. 21, 2014 ("Of the seven employees disciplined for improperly accessing private information, two women and two men were terminated, and two women and one man received lesser forms of discipline. Such evidence demonstrates that women were not treated differently than men with respect to the application of discipline for violating defendant's policies."). Alternatively, even if plaintiff could establish a *prima facie* case, the circumstances surrounding her Performance Improvement Plan and the completion of the technical manual constitute a neutral, non-contextual reason for the termination. Summary judgment thus is appropriate for plaintiff's discrimination claims.

Plaintiff's retaliation claims fare no better. "In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action. Moreover, the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*. If the plaintiff meets this burden, the defendant must then articulate a legitimate nondiscriminatory reason for its actions. If the defendant meets its burden of production, the plaintiff will then have an opportunity to prove that the proffered reason was merely a pretext for retaliation and that the employer's action was prompted by an impermissible motive." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995) (internal quotation and editorial marks and citations omitted), *abrogated in part on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Here, after September 1, 2010, plaintiff engaged in protected activity by

15

meeting with her office's counselor on October 15, 2010 to complain of discriminatory treatment. Plaintiff subsequently received two letters from her supervisor: one on November 12, 2010 explaining her deficiencies and proposing her termination; and one on January 11, 2011 confirming her termination. These two letters satisfy the first element for retaliation but do not satisfy the second or third. The November 12 and January 11 letters followed letters dated March 23, May 27, and June 22, 2010, all of which set forth plaintiff's expectations and deficiencies in meeting them. Guido had given plaintiff the additional resources of weekly meetings with him to review her work product to make sure that it finally would meet expectations. *Cf. Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (summary order) ("Brown's claim that being placed on the Performance Improvement Plan constituted retaliation in violation of Title VII fails at the *prima facie* stage because being placed on the Performance Improvement Plan was not an adverse employment action. The Performance Improvement Plan instructed Brown to attend several seminars, read certain materials, implement ways to reward his co-workers, review and follow a business plan, conduct weekly staff meetings, and implement certain planning and scheduling mechanisms."). From the sole deposition of a coworker that she chose to take, and from her own testimony, plaintiff simply has not provided enough information to allow a reasonable jury to suspect that the November 12 and January 11 letters were anything more than a continuation of a year-long concern about her performance. Under these circumstances, plaintiff has not made out a *prima facie* case for retaliation; and even if she had, defendants have shown legitimate, year-long reasons for the ultimate decision to terminate plaintiff.

**IV.     CONCLUSION**

For all of the foregoing reasons, the Court respectfully recommends granting defendants' motion (Dkt. No. 29).

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655

F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

                                                       __/s Hugh B. Scott_____
                                                       Hon. Hugh B. Scott
                                                       United States Magistrate Judge

DATED: February 21, 2019